UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

DOMINICK BRENNAN, JOSEPH CARBONE, TIVON
FORMAN, GEOFFREY MAUJERI, LATOYA HOLMES-
MCFADDEN, CARMINE PERSICO, GARY
REALMUTO,                                                        **COMPLAINT**

                                        Plaintiffs,

                    -against-                                    Jury Trial Demanded

THE CITY OF NEW YORK, CAPTAIN WILLIAM
TOBIN, JOHN/JANE DOES 1-5,

                                        Defendants.

------------------------------------------------------------------------- x

**PRELIMINARY STATEMENT**

       1.     This is a civil rights action, brought pursuant to 42 U.S.C. § 1983, in

which the plaintiffs allege that the City of New York and officials of the New York City Police

Department ("NYPD") violated their rights under the Due Process Clause of the Fourteenth

Amendment to the Constitution by subjecting them to inhumane conditions of confinement while

they were pre-arraignment detainees in Brooklyn Central Booking ("BCB"), an NYPD holding

facility located at the Criminal Courthouse in downtown Brooklyn.  Plaintiffs were held in BCB

on separate dates ranging from 2016 to 2018.

       2.     In 2013, the plaintiffs in *Cano v. City of New York, et al*, 13-CV-3341

(E.D.N.Y.) brought an identical suit challenging the unconstitutional conditions that were present

in BCB when they were held in the facility on separate dates ranging from 2010 to 2013.  The

district court, after discovery, granted the defendants' motion for summary judgment claiming:

(a) that short-term exposures to inhumane conditions of confinement do not violate the

Constitution; (b) that plaintiffs did not show that the conditions caused them to suffer an actual

serious injury or sickness; and (3) that the defendants responded reasonably to any risks that existed in BCB.

3.     In *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017), the Second Circuit reversed, stating that the "plaintiffs paint a picture of BCB that is alarming and appalling" and have "adduced substantial evidence, much of it uncontroverted, that they were subjected to appalling conditions of confinement to varying degrees and for various time periods." *Id.* at 26, 37.

4.     The Second Circuit rejected the defendants' argument that they were "free to set a system in place whereby they can subject pretrial detainees awaiting arraignment to absolutely atrocious conditions for twenty-four hour periods (and perhaps more) without violating the Constitution so long as nothing actually catastrophic happens during those periods." *Id.* at 37.

5.     The Second Circuit stated that the district court's ruling that "no set of conditions, no matter how egregious, could state a due process violation if the conditions existed for no more than ten to twenty-four hours … was error." *Id.*

6.     The Second Circuit further stated that it had previously "rejected the argument that a plaintiff must prove a serious injury in order to establish a constitutional violation due to inhumane conditions of confinement." *Id.* (citing *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015)).

7.     Finally, the Second Circuit stated that "[c]ontrary to the District Court's ruling that the individual defendants 'establish[ed] [that] they responded reasonably to any risk that existed,' …, the evidence about regularly scheduled cleanings and pest control visits, at best, established that there are genuine disputes as to material facts concerning the handling of

sanitation issues at BCB.  The fact of thrice daily visits by cleaning crews, even if undisputed, would not eliminate the force of the plaintiffs' testimony that the cleaning crews did not do what was needed to clean the cells, or remedy the non-functioning toilets." *Id.* at 39.

## JURISDICTION & VENUE

8.      This action is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

9.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) and (c) because the City of New York and Captain William Tobin are located in this District and because the incident in question occurred in this District.

## JURY TRIAL

10.     Pursuant to Fed. R. Civ. P. 38, plaintiffs demand a jury trial.

## PARTIES

11.     Plaintiffs are residents of the State of New York.

12.     The City of New York is a municipal corporation organized under the laws of the State of New York.

13.     The individual defendants are high level officials of the NYPD and the City of New York.  Captain William Tobin has been the commanding officer of BCB since August 2011.  John/Jane Does 1-5 are officials of the NYPD and the City, unidentified at the time of this pleading, who, along with Captain Tobin, were responsible for the conditions of confinement in BCB when plaintiffs were held in the facility.  The individual defendants acted under color of state law at all relevant times herein.  The individual defendants are sued in their individual capacities.

## STATEMENT OF FACTS

### A.    Background

14.    Almost thirty years ago, the deplorable conditions that exist in BCB and the City of New York's other Central Booking facilities were the subject of a New York Times article, published March 23, 1990, entitled "*Trapped in the Terror of New York's Holding Pens*." As the Times reported,

> They are the holding pens and precinct house cells where people who have been arrested are warehoused - often for two or three days - before they are taken to court. Built decades ago for a different New York, they were meant to hold people for hours, not days, and they are by all accounts too small for the thousands of people now frequently crammed into them each week….There are no mattresses, no bedding, no clean clothing and no showers. The toilets, where there are toilets at all, are open bowls along the walls and often encrusted and overflowing. Meals usually consist of a single slice of baloney and a single slice of American cheese on white bread….People who have been through the system say it is not easy to forget.  Some were threatened by other prisoners.  Others were chained to people who were vomiting and stinking of the streets. With few phone privileges, many felt as if they were lost in a hellish labyrinth far from the lives they had been plucked from.

15.    Further, almost 30 years ago, the City of New York and high-ranking City officials were put on notice of the conditions of BCB when, on March 6, 1990, the Legal Aid Society sent a letter to then Deputy Mayor Milton Mollen, outlining, pursuant to Mollen's suggestion, the nature of the conditions in the City's Central Booking facilities.

16.    The letter stated, in relevant part, as follows:

17.    "All court detention and central booking facilities are chronically overcrowded.  There are no established limits for cell population.  Some of the cells are less than 12 by 15 feet, and may be crammed with as many as 25 people.  There is rarely seating for more

than half of the detainees causing arrestees to stand or sit on the floor." Moreover, "even though arrestees are held for two or three nights, there are no sleeping facilities[,]" meaning that people "either do not sleep during their detention or must try to sleep on a cold, filthy concrete floor with nothing more than a jacket or shirt bundled up as a cushion." "Often arrestees are crowded together, virtually lying on top of each other."

18.    "The toilets are either in full view or partly concealed by low partitions. They are often broken or backed up. Occasionally, toilets overflow onto the floor."

19.    The cells are "filthy and malodorous." They are "infested with roaches and rats and there is usually garbage all over the floor." "The odor is so pungent that attending officers have been observed burning incense." The cells are "poorly ventilated, and some are not ventilated at all." The cells in Brooklyn are located in the sub-basement "with no provision for ventilation." "In hot summer months, long hours spent in a stifling, vile-smelling, unventilated holding pen are unbearable. Lighting is dim and often non-existent."

20.    Once an arrestee reaches a Central Booking facility, the City "provides only bologna and cheese sandwiches and only at specified times." "Because of the cramped conditions of the cells, detainees often have to eat near the open toilet. Many detainees, who are in transit when the sandwiches are given out, must endure long periods with no food at all."

21.    There is "no medical care in the pens. Prisoners with serious problems may remain untreated for several days. Diabetics and AIDS victims may be unable to obtain their medicine. Physically sick and psychotic arrestees are thrown in with the others and mingle in close proximity for days. Arrestees who request medical attention are discouraged from pursuing their requests." The arrestees are told that medical care is "available only at a hospital

5

and will delay their arraignment by a day or more." Only if an arrestee is "insistent or obviously ill, for example, bleeding or unconscious, is he or she taken to a hospital."

22. The Legal Aid Society's March 6, 1990 letter was received and reviewed by then Deputy Mayor Mollen and other City officials. The municipal officials confirmed that the conditions described in the letter did in fact exist.

23. The conditions described in the Legal Aid Society's letter still existed in BCB when *Cano v. City of New York* was filed in the Eastern District in 2013.

24. The conditions described in the Legal Aid Society's letter existed in large part in BCB when the plaintiffs in this case were held in the facility.

**B.     The Plaintiffs**

25. The plaintiffs in this case were held in BCB on separate dates ranging from 2016 to 2018.

26. Dominick Brennan was held in BCB after his arrests on August 14, 2018 and September 17, 2018

27. Joseph Carbone was held in BCB after his arrest on July 1, 2018.

28. Tivon Forman was held in BCB after his arrest on January 11, 2018.

29. Geoffrey Maujeri was held in BCB after his arrest on June 7, 2018.

30. Latoya Holmes-McFadden was held in BCB after her arrest on January 2, 2019. Latoya was four months pregnant when she was held in BCB. Although Latoya told BCB employees, including a captain, that her pregnancy was high-risk and that she suffered from subchorionic hemorrhaging, they refused to provide her with a "medical walk-through" because she was not at least twenty weeks pregnant.

31. Carmine Persico was held in BCB after his arrest on November 29, 2016.

32.     Gary Realmuto was held in BCB on after his arrests on August 19, 2018

and September 1, 2018.

**C.     The Conditions**

33.     The plaintiffs were subjected in varying degrees to some or all of the

conditions described below.  As explained by the Second Circuit in *Darnell*, "[e]ach of these

conditions must be measured by its severity and duration, not the resulting injury, and none of

these conditions is subject to a bright-line durational or severity threshold.  Moreover, the

conditions must be analyzed in combination, not in isolation, at least where one alleged

deprivation has a bearing on another..."  849 F.3d at 32.

34.     Overcrowding:  For the majority of their respective confinements at BCB,

the plaintiffs were packed into overcrowded cells.  Because the cells were so full, there was often

only space to stand for hours at a time.  When a space opened-up, the plaintiffs had to sit or lie

down on the filthy, hard ground.  While some of the cells contained hard benches, there were not

nearly enough benches to accommodate its numerous occupants.

35.     Unsanitary Toilets:  Each cell at BCB contained, at best, one exposed

toilet that lacked a seat, lid, or sufficient privacy partitions to conceal a toilet user from his or her

fellow detainees.  The toilet rim and bowl, along with the surrounding floor and walls, were

often covered with some combination of feces, urine and other excrement.  The toilets were

frequently clogged and would overflow.  The smell was horrific and overbearing.  Toilet paper

was not provided to the majority of the plaintiffs, even upon request, the officers choosing to

instead engage in personal conversations with each other or play on their cell phones.

36.     Garbage and Inadequate Sanitation:  The cells had garbage scattered over

the ground as well as urine, feces and other excrement splattered in sections of the floor.

Because there are no trash cans in the cells, detainees are expected to put their garbage on the floor.  None of the plaintiffs saw any BCB employees clean the cells when they were held in the facility.

37.    Infestation:  Most of the plaintiffs were held in cells which were infested with cockroaches, flies and other insects.  Some plaintiffs observed mice in their cells.

38.    Lack of Toiletries and Other Hygienic Items:  Plaintiffs were not provided with basic toiletries, such as soap, tissues, hand wipes, hand sanitizer, toothbrushes or toothpaste.  Moreover, as stated above, most of the plaintiffs were denied toilet paper.  BCB officers refused to provide toilet paper, or ignored requests for toilet paper, choosing to instead engage in personal conversations with each other or play on their cell phones.

39.    Inadequate Nutrition and Water:  The food and water provisions in BCB were nutritionally inadequate.  Plaintiffs were not provided with fresh, clean drinking water, and for most of the plaintiffs, the only water available was from a sink that was adjacent to a filthy toilet.  Adequate food was not provided.  If sandwiches were provided, they were moldy, rotten, stale, or otherwise inedible.  Some of the plaintiffs were given a small box of cereal, but were not given plastic utensils or a bowl in which to eat the cereal.

40.    Extreme Temperatures and Poor Ventilation:  Plaintiffs were subjected to extremely cold or hot temperatures while they were held in BCB.  Moreover, the cells lacked ventilation, which exacerbated the odor problems.  In contrast, many of the officers in BCB had fans blowing on them, but not on the detainees.

41.    Sleep Deprivation:  Plaintiffs were held overnight or for a substantial number of hours in BCB and suffered sleep deprivation because they were not provided with any sleeping provisions, such as mats, beds, cots, pillows or blankets.  Some of the plaintiffs were so

desperate that they attempted to sleep on the filthy, hard floor or on one of the hard benches in

the cells.  If one chose to disregard the filth, there was generally no room on the floor to lie

down.

42.    Crime and Intimidation:  Plaintiffs were held in cells which were for the

most part unsupervised and where BCB officers were deliberately indifferent to fights, thefts and

bullying.  Violent criminals charged with crimes including murder are held in the same cells as

minor offenders and some detainees threaten and assault the weaker detainees.  Some plaintiffs

overheard their fellow detainees discussing their violent crimes.  Moreover, some plaintiffs

observed detainees smoking marijuana in the cells, which the officers ignored.

**D.    Municipal and Supervisory Liability**

43.    Captain William Tobin has been the commanding officer of BCB since

August 2011 and is one of the City officials responsible for the conditions of BCB.  Captain

Tobin is aware of the unlawful conditions that exist in BCB from observing the conditions

firsthand during his daily rounds, from reports from his fellow officers and subordinates, and

from documents, complaints and lawsuits.  Captain Tobin is one of the municipal officials

responsible for setting the final policies on the operation of BCB.

44.    John/Jane Does 1-5 and other high-level municipal officials are

responsible for the conditions of BCB, are aware of the unlawful conditions that exist in BCB

from observing the conditions firsthand during their tours of the facility, from reports from their

fellow officials and subordinates, and from documents, complaints and lawsuits.  These

municipal officials are responsible for setting the final policies on the operation of BCB.

45.     Captain Tobin, John/Jane Does 1-5 and the other high-level municipal officials have failed to implement adequate remedial measures to address the unlawful conditions that exist in BCB and have tacitly authorized the conditions.

46.     The City of New York, as an entity, has actual and constructive notice of the unlawful conditions that exist in BCB through the observations of its high-level officials, from reports from municipal officials and employees, and from documents, complaints and lawsuits.

47.     The unlawful conditions of BCB have been in existence for over thirty years and constitute a persistent, well-settled and pervasive practice or custom that the City of New York and its high-level officials have allowed to exist, despite the injurious effects that the conditions have had on pre-arraignment detainees.  Despite having both actual and constructive notice of the unlawful conditions, the City and high-level municipal officials have never implemented adequate remedial measures and have tacitly authorized the conditions.

48.     The City of New York and high-level municipal officials have exhibited deliberate indifference to the unlawful conditions that exist in BCB by failing to train municipal employees, contractors and agents on how to maintain safe and humane conditions in the facility, and by failing to retrain, discipline or terminate those who contribute to the deprivations.  Rather than take appropriate action, the City and high-level municipal officials knowingly acquiesce in the unlawful behavior of their subordinates, contractors and agents.

**E.     Damages**

49.     As a result of defendants' actions, plaintiffs have suffered damages, including, but not limited to, emotional distress, mental anguish, fear, anxiety, and physical

ailments, including head and body pain, hunger, thirst, sleep deprivation, extreme fatigue,

nausea, dizziness, lightheadedness, and significant physical discomfort.

## FIRST CLAIM

### § 1983; VIOLATION OF DUE PROCESS

(Against all Defendants)

50.     Plaintiffs repeat the foregoing allegations.

51.     The Due Process Clause of the Fourteenth Amendment imposes a duty on

municipalities and municipal officials and employees to take reasonable measures to ensure that

pre-trial detainees are held under safe and humane conditions.

52.     Moreover, because pre-trial detainees have not been convicted of any

crime and are presumed innocent, they may not be punished in any manner.  Accordingly,

punitive or punishing conditions of confinement may not be lawfully imposed on them.

53.     The defendants breached their duty under the Fourteenth Amendment

and/or punished plaintiffs by subjecting plaintiffs to conditions in BCB that, either alone or in

combination, posed an unreasonable risk of serious damage to plaintiffs' health or physical and

mental soundness.

54.     The defendants were deliberately indifferent to the unlawful conditions of

BCB as they knowingly imposed the conditions or recklessly failed to act with reasonable care to

mitigate or lessen the risk that the conditions posed to the plaintiffs, even though the defendants

knew, or should have known, that the conditions posed an excessive risk to plaintiffs' health or

safety.

55.    The unconstitutional conditions that exist in BCB are a policy, practice and/or custom of the City of New York.

56.    Defendants' conduct caused plaintiffs to suffer various personal injuries, including the injuries described herein.

57.    As a result of the foregoing, plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

## SECOND CLAIM

### § 1983; SUPERVISORY LIABILITY

(Against the Individual Defendants)

58.    Plaintiffs repeat the foregoing allegations.

59.    The individual defendants are liable to the plaintiffs under the Fourteenth Amendment because they: (a) participated directly in the constitutional violations; (b) failed to remedy the illegal practices at issue after being informed of their existence; (c) created a policy, practice or custom under which the unconstitutional practices occurred, or allowed the continuance of the policy, practice or custom; (d) were grossly negligent in supervising the subordinates who committed the wrongful acts; and/or (e) exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring.

60.    Defendants' conduct caused plaintiffs to suffer various personal injuries, including the injuries described herein.

61.    As a result of the foregoing, plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

## THIRD CLAIM

### § 1983; FAILURE TO INTERVENE

(Against the Individual Defendants)

62.     Plaintiffs repeat the foregoing allegations.

63.     The individual defendants, while acting under color of state law, had a reasonable opportunity to prevent the violations of plaintiffs' rights under the Fourteenth Amendments, but they failed to fulfill their constitutional obligation to intervene and address the unlawful conditions that exist in BCB.

64.     Defendants' conduct caused plaintiffs to suffer various personal injuries, including the injuries described herein.

65.     As a result of the foregoing, plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

WHEREFORE, plaintiffs request the following relief jointly and severally against the defendants:

a.      Compensatory damages in an amount to be determined by a jury;

b.      Punitive damages in an amount to be determined by a jury;

c.      Attorney's fees and costs;

d.      Such other and further relief as the Court may deem just and proper.

DATED:  April 9, 2019


_____/s/_____
RICHARD CARDINALE
Attorney at Law
26 Court Street, Suite # 1815
Brooklyn, New York 11242
(718) 624-9391
richcardinale@gmail.com


IZABEL OLSZOWA GARCIA
Attorney at Law
26 Court Street, Suite # 1815
Brooklyn, New York 11242
(718) 624-4734
(646) 239-4330
iogarcia@aol.com